MURPHY Admr. v SNYDER

Ohio Appeals, 3rd Dist. Mercer Co

No 465.  Decided Jan 21, 1939

B. A. Myers, Celina, for plaintiff-appellee.

Loree & Younger, Celina; Marshall & Harlan, Dayton, for defendant-appellant.

## OPINION

### BY THE COURT:

This is an appeal on questions of law from a judgment of the Court of Common Pleas of Mercer county, in an action for damages for wrongful death, pending therein wherein the appellee, William F. Murphy, as administrator of the estate of Thelma May Murphy, deceased, was plaintiff and the appellant, Irvin A. Snyder, was defendant. The action was brought by William F. Murphy as administrator aforesaid, against Irvin A. Snyder to recover for injuries resulting in the death of plaintiff's decedent in an automobile accident on Friday, July 13, 1934.

Thelma May Murphy was a guest in the car owned and driven by Irvin A. Snyder, and this cause of action arises under §6308-6, GC, known as the guest statute.

The collision in which plaintiff's decedent sustained her injuries occurred at the intersection of State Highways No. 54 and 117, about six miles north of the city of Celina. Six persons were riding in the car at the time of the accident. Snyder was driving the car at a speed of approximately forty-five to sixty miles per. hour, as testified to by different witnesses. On the left running-board of the car was a baggage carrier loaded with the baggage of the occupants of the car. At the intersection of Highways No. 54 and 127 a signal light constructed under the statute of the State of Ohio was in operation with the usual signals directing traffic at the intersection. The car was being driven by Snyder in a northerly direction on State Route No. 127 running due north and south. At ne point where the collision occurred State Route 127 is intersected by State Route No. 54 running in a northwest and southeasterly direction. At the intersection of the two highways there were two large filling stations, one on the southwest corner of the intersection which is a Sohio station and in connection with

which there is an eating place. There were large signs in front of said filling station and at or near the southwest corner of said highway intersection advertising said filling station and the eating place conducted in connection with it. The Sohio sign is the usual flash sign of the Standard Oil Company of Ohio. On the northeast corner of the intersection was what was known as "Shady Rest Filling Station" which was also advertised by signs at said station along the west side of said Highway Number 117.

The evidence tends to prove that as the defendant approached the intersection at the speed hereinfore mentioned, he looked to the left running-board at the baggage and then back to the road; that as he looked back he was close to the intersection and then first observed an automobile driven by one Coppersmith, also at the intersection approaching on Route 54 from his right; that Snyder swerved his car to the left and stepped on the accelerator in an effort to avoid the impending collision That the Coppersmith car collided with the right rear of the car driven by Snyder, such collision resulting in plaintiff's decedent sustaining the injuries from which she died.

The evidence fails to show which color of light was being exhibited by the traffic light at the time of the accident, to the traffic on either highway but there is evidence tending to show that the traffic light exhibited a red light toward the traffic on Route 127 immediately following the collision.

The evidence of Snyder was to the effect that he did not see the traffic light nor know that one was there, and did not know that there was an intersection at the point mentioned, and did not know that the Coppersmith car was approaching, but there is evidence tending to prove that at some certain time along the road on which he was driving he did see an automobile across the field.

Robert D. Rothaar, Joseph Stemley, Julia Stemley and William Murphy, none of whom were present at the time of the collision, testified as follows as to the details of the collision as told to them by Snyder subsequent to the collision:

Robert D. Rothaar:

"A. Well, Snyder told me as they were travelling in a northerly direction —I suspect this road runs north on 127, that they were on their way to Chicago, and that a certain,—some certain time along that road that he did see an automobile across the field, and that a little further on he was telling me the exact, or just about now he thought this thing happened, that he was checking his wrist watch with his speedometer, something like this (indicating), when someone said 'There is a red light and a car' and he said that he stepped on the gas hoping to clear the intersection before the other car hit them."

"At the time he said he was looking at his wrist watch did he indicate, in any way, with his arm how he was looking at his watch? I want that in the record."

"A. The most vivid memory I have of that, he said that he was looking down and that when his attention was called to the car and the light, that when he looked up the car was right there."

Joseph Stemley:

" * * * and they were driving along and at the time that the accident took place, as near as he knew what he was doing at that time, he was checking his time from his watch with the speedometer of the car. That was at the time the accident took place.

"Q. Well, do you remember anything further that he said to you on that occasion?

"A. Well, the only thing further he did tell me that I recall of, was the fact that when he saw this car, he said he stepped on the gas to beat it across."

62

Julia Stemley:

"A. That was in this room, and I was sitting in one chair, on the side of the bed, and my brother was on the other side, and Mr. Snyder was at the end of the bed,—the foot of the bed. Just as my brother came in he says, 'Well, how did this happen,' and she says, 'Well', she says, 'I told Mr. Snyder there was a red light and to watch that machine, and he says, 'I can beat it.' Then he repeated, he says, 'I thought I could'."

William F. Murphy:

"A. I asked her how it happened; she told me they were travelling around fifty, fifty-five mile an hour, she expected; she wasn't sure; she knew they were travelling pretty fast; she said, 'I seen this red light, I told Irvin to watch that red light and watch that car; ne said, 'I will beat it across'. He spoke up and said 'I thought I could beat it.' "

These alleged conversations are denied by the defendant.

Resolving all conflicts in the testimony, in favor of plaintiff and viewing the evidence in the light most favorable to plaintiff, it tends to prove that the defendant was driving his car at the time in question at a rate of speed of between fifty-five and sixty miles per hour; that while so driving his car in which he was carrying, besides himself, five other passengers, ne looked out of the window to check the baggage which had been tied to the lefthand running board; that immediately after checking as to how the baggage was riding he stooped over to check his wrist watch with the speedometer of his automobile to determine the correctness of the speedometer and that in so doing he failed to make any observation of the highway on which he was travelling at the rate of speed mentioned; he failed to see a car approaching immediately ahead of him on a straight highway; he failed to see the large signs extending from the filling sta-

tions out into the highway; he failed to see the traffic light; he failed to observe the buildings to the right and a short distance south of the intersection of said highways; all this after observing across a field and before it arrived at the interection, the Coppersmith car with which he collided, approaching the intersection from his right on Route No. 54; and when at the intersection his attention was called to the Coppersmith car approaching on his right at said intersection, said "I can beat it" (referring to the Coppersmith car) and stepped on the accelerator of his car so as to increase the speed, and passed in front of the Coppersmith car in such a manner that the same collided with the right rear of his car.

There are a number of assignments of error, but in the view we take of this case it is necessary to consider only the assignments of error hereafter set forth, as a consideration of these assignments disposes of the entire case. The assignments referred to are as follows:

"The court erred in the trial of this case in refusing to sustain and overruling motion of defendant below, now appellant, made at the close of all the evidence offered by plaintiff, and after plaintiff had rested, and renewed at the close of all the evidence in the case, and after both plaintiff and defendant had rested, to direct a verdict for defendant for the reasons set out in said motion, to which actions of the court in refusing to sustain and overruling said motion defendant by his counsel at the time excepted.

Error of the court in overruling motion of defendant below, now appellant, for a judgment for defendant and against plaintiff, notwithstanding the verdict for plaintiff, to which action of the court, defendant excepted."

These assignments will be considered together.

Whatever right the plaintiff has to recover in this case is governed by the

provisions of §6308-6 GC, reading as follows:

"The owner, operator or person responsible for the operation of a motor vehicle shall not be liable for loss or damage arising from injuries to or death of a guest while being transported without payment therefor in or upon said motor vehicle resulting from the operation thereof unless such injuries or death are caused by the wilful or wanton misconduct of such operator, owner or person responsible for the operation of such motor vehicle."

Under the provisions of said section, unless the injuries sustained by plaintiff's decedent resulting in her death were caused by the wilful or wanton misconduct of the defendant in the operation of the automobile in which plaintiff's decedent was riding as a guest, plaintiff is not entitled to recover.

In the petition the plaintiff charged the defendant with wilful and wanton misconduct in the operation of defendant's said automobile, causing the injuries and death of plaintiff's decedent, so that under the assignments of error mentioned the question arises as to whether there is any substantial evidence tending to prove wilful or wanton misconduct of the defendant in the operation of his automobile, causing the injuries to plaintiff's decedent resulting in her death.

In the case of Universal Concrete Pipe Company v Bassett, 130 Oh St 567, Judge Stevenson, at page 575, in his opinion quotes with approval from 20 Ruling Case Law, page 20, Section 15, as follows:

"To constitute wilful injury, there must be design, purpose and intent to do wrong and inflict the injury; while to constitute wanton negligence, the party doing the act or failing to act must be conscious of his conduct, and, though having no intent to injure, must be conscious, from his knowledge of surrounding circumstances and existing conditions, that his conduct will naturally or probably result in injury."

At other places in the opinion the expression "wanton negligence" is disapproved as being incorrect, and it is stated that although actions for wilful misconduct have often been treated under the head of negligence actions, an action based upon wilful or wanton misconduct is apart from the action for negligent conduct, and the difference is one of kind, not merely of degree and that negligence does not have for its base either wilfulness or wantonness, while misconduct which is merely negligence, is never either wilful or wanton.

In the second paragraph of the syllabus of the case, the following definition appears:

"Wanton misconduct is such conduct as manifests a disposition to perversity, and it must be under such surrounding circumstances and existing conditions that the party doing the act or failing to act must be conscious, from his knowledge of surrounding circumstances and existing conditions, that his conduct will in all common probability result in injury."

In the sixth paragraph of the syllabus of the case of Payne, Director General of Railroads v Vance, 103 Oh St 59, it is held that:

"Wilful tort is not shown by proving a simple violation of a statute or ordinance unaccompanied by the intent or purpose to do injury after knowledge of danger, or failure after such knowl-

64

edge to use ordinary care to avoid injury."

Under the reasoning upon which this holding is based, an act or omission or multiple acts or omissions violative of statutory or common law duties to exercise care for the safety of or not to injure another, do not constitute wilful or wanton misconduct unless accompanied by the intent or purpose to do injury, after knowledge of danger, or failure after such knowledge to use ordinary care to avoid injury.

In the second and third paragraphs of the syllabus in the case of **Vecchio v Vecchio, 131 Oh St 59**, it is held:

"In an action for damages for personal injuries instituted by a guest against the operator of a motor vehicle, under favor of §6308-6, GC, such guest must plead facts that reveal on their face the element of wilfulness or wantonness, else such pleading is demurrable.

"In such action the guest must plead unequivocally that the operator of the motor vehicle had knowledge of existing conditions; otherwise no liability is fixed."

It is obvious that the rules applicable to the pleading of such facts are equally applicable to the proof of such facts.

Examining the evidence in the case at bar, in the light of the rules of law mentioned, it is obvious that while there is evidence tending to prove multiple negligent acts and omissions on the part of the defendant, there is no evidence tending to prove such conduct on the part of the defendant as manifested a disposition to perversity, under such surrounding circumstances and existing conditions that the defendant in doing the act or failing to do the act must have been conscious, from his knowledge of such surrounding circumstances and existing conditions, that his conduct would in all common probability result in injury. The most that the evidence tends to prove is that the defendant negligently placed himself in a position of peril at or in close proximity to the intersection and that upon such perilous situation then coming to his knowledge he, in the existing emergency, determined to and did accelerate his speed in an effort to drive across the intersection in front of the Coppersmith car approaching from his right, resulting in the collision between the Coppersmith car and the right rear of the car driven by defendant; and there is no evidence tending to prove that the defendant, acting otherwise at the time his dangerous situation was brought to his knowledge, could have avoided the collision and consequent injuries of plaintiff's decedent. The defendant's statement that, "I can beat it", and "I thought I could beat it" did not tend to prove conduct on the part of the defendant manifesting a disposition to perversity; nor consciousness on his part, from his knowledge of such circumstances and existing conditions, that his conduct would in all common probability result in injury; nor failure after knowledge of danger to exercise ordinary care.

There being no evidence tending to prove wilful or wanton misconduct on the part of the defendant, the motion for a directed verdict made at the close of plaintiff's evidence and renewed at the close of all the evidence, as well as the motion for judgment nowithstanding the verdict, should have been granted by the trial court, and for the error of the trial court in overruling these motions the judgment will be reversed, and this court rendering the judgment the trial court should have rendered on said motions will enter final judgment in favor of the defendant, at costs of plaintiff-appellee.

GUERNSEY, PJ, CROW & KLINGER, JJ, concur.